UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA REYES, | ) | |
| ex rel., J.R., a minor, | ) | Case No. 1:17CV0943 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Sandra Reyes ("Reyes" or "claimant") challenges the final decision of

Defendant Commissioner of Social Security ("Commissioner"), denying Reyes's  application, on

behalf of her minor son, J.R., for Supplemental Security Income benefits under Title XVI of the

Social Security Act, 42 U.S.C § 1381 *et seq*. ("Act").  This court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to

an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the

reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be REVERSED and REMANDED.


I.  PROCEDURAL HISTORY

On April 21, 2014, Reyes protectively filed an application for Supplemental Security

Income ("SSI") benefits on behalf of her minor son, J.R., with an amended disability onset date

of April 21, 2014.  (R. 10, PageID #: 68, 185, 219-222, 242-250.)  Reyes alleged that J.R.'s

disabling conditions were "attention deficit hyperactivity disorder, dyslexia, and anger issues."

1

(R. 10, PageID #: 246.)  J.R. was in special programs at school for a learning disability (reading) and ADHD.  (R. 10, PageID #: 253.)  His behavior problems, according to his mother, included lack of respect for the school staff, fighting and threatening students and staff.  *Id.* at PageID #: 254.

Reyes' application was denied initially and upon reconsideration.  (R. 10, PageID #: 149-162, 163-174.)  On November 13, 2014, Reyes filed a written request for a hearing before an administrative law judge ("ALJ").  (R. 10, PageID #: 192-193.)  The ALJ held a hearing on March 21, 2016.  (*Id.* at 91-129.)  J.R. and his mother Reyes appeared at the hearing, were represented by counsel, and testified.  (*Id.* at 97-112.)

Social Security Administration regulations require an ALJ to follow a three-step sequential analysis in making a determination regarding disability for a person under eighteen years old.  *See* 20 C.F.R. § 416.924(a).  On May 2, 2016, the ALJ applied the three-step sequential analysis and concluded J.R. was not disabled.  (R. 10, PageID #: 68-86.)  Reyes sought review of the ALJ's decision from the Appeals Council, which denied the request for review thereby rendering the ALJ's decision the final decision of the Commissioner.  (R. 10, PageID #: 52-54, 63-64.)  Reyes now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c), and raises the following legal issue:  "Substantial evidence does not support the Administrative Law Judge's determination that the plaintiff had less than marked limitations in the domains of caring for self, and attending and completing tasks, in light of the medical evidence and the opinions of Megan Clark and Ms. Schmidt."  (R. 13, PageID #: 705.)

## II. PERSONAL BACKGROUND INFORMATION

J.R. was born on December **, 2002, and was eleven years old on his application date. (R. 10, PageID #: 71, 219, 243.)  Accordingly, J.R. was a school-age child on the application date and considered an adolescent for Social Security purposes.  *See* 20 C.F.R. § 416.926a(g)(2)).

## III.  RELEVANT MEDICAL EVIDENCE[1]

Reyes applied for SSI on April 21, 2014, alleging that J.R.'s disabling conditions were "attention deficit hyperactivity disorder, dyslexia, and anger issues."  (R. 10, PageID #: 68, 185, 219-222, 246.)  At the hearing, counsel asserted that the thirteen-year-old claimant had a history of significant psychiatric impairments, including diagnoses for post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), mood disorder, and oppositional defiant disorder ("ODD").  *Id.* at PageID #: 113.

On January 29, 2014, Applewood staff prepared a Mental Health Assessment.  (R. 10, PageID #: 432-440.)  J.R. was referred to Applewood by his school psychologist who reported that J.R. was unable to focus and had difficulty expressing his feelings.  *Id.* at 432.  Resulting issues included aggressive behavior, inability to focus, mood swings, and academic problems. *Id.*  J.R. and his mother recognized that he needed help with his angry behavior.  *Id.* J.R. was reported difficulty making and keeping friends, and frequent and aggressive conflicts with peers.

---

[1] The summary of relevant medical evidence is not intended to be exhaustive.  It includes only those portions of the record cited by the parties and also deemed relevant by the court to the assignments of error raised.

*Id.* at 434, 438.  He was found to be oppositional, argumentative, impulsive, easily distracted, and moody.  *Id.* at 434.

Regarding his educational functioning, J.R. was working below his ability level, with poor attendance, and two suspensions in the current school year, one for threatening a teacher, and the other for fighting with another student.  (R. 10, PageID #: 435.)  The learning assessment found J.R. had difficulty reading and writing.  *Id.* at 436.  The assessment noted a history of trauma, including that his favorite uncle had been fatally shot in the head when J.R. was in kindergarten.  *Id.*  At that time, J.R. drew a picture about the uncle, depicting a body with blood coming out of his head.  *Id.*

A mental status exam, also in January 2014, revealed that J.R. had difficulty sleeping, but was otherwise unremarkable.  (R. 10, PageID #: 437.)  The clinical summary indicated J.R. often exhibits aggressive behavior verbally and physically with his peers, authority figures, and his immediate family.  *Id.* at 439.  Once or twice a month, he verbalizes that he wants to harm himself or die.  *Id.*  J.R. stated that his goals were to learn how to calm himself down, and to manage his anger.  *Id.*

The Applewood counselor noted that J.R. had been diagnosed with ADHD and was taking Adderall.  (R. 10, PageID #: 439.)  The counselor requested a referral to a psychiatrist to rule out a possible bipolar diagnosis, based on J.R.'s frequent mood swings and the severity of his aggressive behavior.  *Id.* at 439-440.

On April 28, 2014, Megan Clark, a board-certified psychiatric clinical nurse specialist, conducted a psychiatric diagnostic interview of J.R. at Applewood Centers.  (R. 10, PageID #: 462-467.)  J.R. had been referred for exhibiting aggressive behavior, such as threatening a teacher and fighting with peers, and suspensions from school for aggressive behavior.  *Id.* at 462.

4

Nurse Clark noted J.R. had problems with insomnia, and depression once or twice a month, with thoughts of self-harm.  *Id.*  The cause of his insomnia may be, in part, PTSD, because J.R. was impacted by his uncle's shooting death.  *Id.*  He cried, had shakes, and had nightmares.  *Id.*  J.R. had disruptive mood symptoms and conduct problems.  *Id.*

J.R.'s mother reported that J.R. was inattentive and forgetful, did not seem to listen when addressed directly, and often did not follow instructions or finish his homework.  (R. 10, PageID #: 462.)  She also reported hyperactive and impulsive symptoms, indicating J.R. was often fidgety and had trouble staying in his seat, that he was often restless, runs or climbs excessively, and often interrupts others.  *Id.*  The mother stated that J.R. often lost his temper, argued with adults, and defied or refused to comply with adult's commands.  *Id.*  She said he was often angry or resentful, spiteful and vindictive.  *Id.  See also* R. 10, PageID #: 464-465 (mental status exam).

During the April 2014 assessment, Nurse Clark diagnosed J.R. with ADHD, combined type, PTSD, Mood Disorder, NOS (Disruptive Mood Dysregulation Disorder) and ODD.  (R. 10, PageID #: 465-466.)  The plan was to start the claimant on Seroquel (for sleep, PTSD, nightmares and aggression) and Concerta (for ADHD symptoms), with follow-up behavioral health counseling.  *Id.*

The next month, on May 19, 2014, an updated Mental Health Assessment was prepared at Applewood, based on new information provided as a result of the April 28 psychiatric assessment.  (R. 10, PageID #: 431.)  The counselor noted that new diagnoses of PTSD and ODD had been added to her original diagnoses of ADHD and Mood Disorder, NOS, designating PTSD as the primary diagnosis, with ADHD as the secondary diagnosis.  *Id.*  The counselor confirmed

5

that J.R. did not actually witness the shooting of his uncle, but had been informed of it by his mother.  *Id.*

An Individualized Education Program ("IEP") was completed for J.R. on November 11, 2014.  (R. 10, PageID #: 302-314.)  The IEP noted that J.R.'s mother "would like to see him read and understand what he is reading."  *Id.* at 303.  J.R. had to repeat first grade, and he was in 5th grade at the time of the IEP.  *Id.*  Current areas of concern included:  "reading rate and comprehension, basic math skills, writing homework completion, and attention to task."  *Id.*  The IEP set out measurable annual goals for reading comprehension and reading fluency (*id.* at PageID #: 306), and for written expression (*id.* at PageID #: 308).

During a February 17, 2015, psychiatric follow-up with Nurse Clark at Applewood, J.R. reported that he was taking his medications, without side effects, and that he was sleeping fine at night.  (R. 10, PageID #: 657.)  J.R. was having continuing problems with attitude, had gotten into a fight with another student, and was suspended.  *Id.*  Although he was focusing at school, he was not turning in his schoolwork.  *Id.* Nurse Clark increased the dosage of Concerta to address his problems of impulsivity.  *Id.* at PageID #: 659.

During a May 21, 2015, follow-up with Nurse Clark at Applewood, J.R. reported that he was taking his medications, without side effects, that he was sleeping fine at night, and his mood was happy.  (R. 10, PageID #: 654.)  He was focusing at school, and his grades were improving.  *Id.*  However, J.R. continued to have problems getting along with peers and fighting.  *Id.*

On August 27, 2015, Nurse Clark noted J.R. was "minimally able to express thoughts and feelings."  (R. 10, PageID #: 686.)  The claimant stated he will not let anyone harm him, but he stared and shut down when asked if he would harm others.  *Id.*  His mother reported he was having mood swings, fighting, and was hyperactive.  *Id.*  He was found to be hiding knives

around the apartment complex.  *Id.* at 686, 688.  Mental status exam revealed decreased impulse control and decreased frustration tolerance.  *Id.* at 686.

Nurse Clark's diagnosis at the August 27 visit was ADHD combined, PTSD, Mood Disorder, NOS, and ODD.  (R. 10, PageID #: 688.)  J.R. was taking Concerta for ADHD, and Seroquel at bedtime for PTSD, nightmares, and sleep.  *Id.*  He was to start Fluoxetine (Prozac) for irritability and PTSD.  *Id.*  The family was counseled to monitor closely his mood, behavior and any suicidal thoughts, because Prozac can adversely affect mood, or worsen suicidal thoughts.  *Id.*

Goals for J.R. as expressed in Individualized Service Plan reviews dated August 28, 2015, and October 2, 2015, included sustaining attention and concentration for consistently longer periods of time (R. 10, PageID #: 662, 673); significantly reducing the intensity and frequency of angry verbal and physical outbursts (*id.* at PageID #: 663, 674); elevating and stabilizing his mood (*id.* at PageID #: 665, 676); and, processing his traumatic experiences, learning to regulate his emotions, managing his distress, and developing skills for successful functioning (*id.* at PageID #: 667, 678).

During a follow-up appointment at Applewood on October 9, 2015, staff noted that J.R. had an impaired concentration or ability to focus, and he appeared angry.  (R. 10, PageID #: 684.)  It was noted that his father had died suddenly in a motorcycle accident a few weeks earlier.  *Id.*  J.R. was very angry, more defiant, and had stopped taking his medications, except for Seroquel at night.  *Id.* at 683-684.  He was interested in a higher dose of Seroquel to help with sleep.  *Id.* at 684.  J.R.'s school was placing him in a smaller classroom to help accommodate "his hyper[activity] and distract[i]bility."  *Id.*

For the sixth grade IEP, the team decided that there needed to be a behavior focus in his plan because of "recent escalating behaviors" both at home and at school.  (R. 10, PageID #: 369.)  The IEP completed on November 10, 2015, noted that J.R. needed assistance with anger management; focusing on school work; getting along with his peers, teachers, and family; and his father's recent fatal accident.  *Id.* at 355.  He had difficulty focusing in class; was easily angered, displayed unpredictable behavior; missed a lot of school due to excused and unexcused absences, and suspensions; and he was struggling to complete his work.  *Id.*  The IEP set out measurable annual goals for reading comprehension (*id.* at PageID #: 358), and for behavior (*id.* at PageID #: 360).

Opinion Evidence at Issue

On July 17, 2014, J.R. appeared for a psychological examination with a state agency consultative examiner, psychologist David V. House, Ph.D.  (R. 10, PageID #: 618-623.)  At the time of the exam, J.R. was eleven years old and in fifth grade.  *Id.* at 619, 620.  J.R.'s mother reported that he does not get along with others, and has "a big problem with other children and authority."  *Id.* at 619.  She reported that he has tantrums two or three times daily, that "anything" makes him frustrated, that he will throw things, hit himself and scratch his face.  *Id.*  J.R.'s mother reported that J.R. cannot be around other children, and that he fights with his brother.  *Id.* at 620.  She stated that since he had been on medication, his behavior at school had been a lot better.  *Id.*  During the previous academic year (i.e., fourth grade), J.R. had been suspended between twenty and thirty times, and on occasion, the police were called.  *Id.*  He had threatened to shoot a teacher and another student, and was getting into fights with security.  *Id.*

8

The claimant's mother reported to Dr. House that J.R. watched television for hours, and played rather violent video games.  (R. 10, PageID #: 620.)  He rides his bike alone, and did not play with other children.  *Id.*  She had to argue with J.R. to get him to brush his teeth or take a bath.  *Id.*  J.R. had made recent statements that he wanted to die, and he had threatened to harm his brother.  *Id.*  J.R. reported problems sleeping, complained of being bored, worried, and easily angered.  *Id.* at 621.  He denied that he was happy, and said he was sad mostly.  *Id.*  He has tried to hurt himself, and he cries excessively.  *Id.*  J.R. reported that he hears his name called, which frightens him, and he sometimes sees shadows, especially after having watched a ghost movie. *Id.*

Dr. House diagnosed J.R. with PTSD, Attention Deficit Disorder with hyperactivity, and Dissociative Disorder Not Elsewhere Classified with Depersonalization.  (R. 10, PageID #: 621, 622.)  Dr. House provided functional assessments in four areas.  *Id.* at 621-622.  Relevant to the issues before the court are Dr. House's assessment of J.R.'s limitations in the domains of caring for self, and attending and completing tasks.  *See generally* R. 13, PageID #: 705.

Concerning J.R.'s abilities and limitations in attending to and completing tasks, Dr. House opined:

> [J.R.] can pay attention to some degree in response to direct questions from an adult in a one-on-one situation.  It would appear that he has difficulty sustaining attention for longer periods of time.  He does take medication to assist in maintaining his focus.  It is noted that he has done much better in a group setting at his current level of medication.  Prior, he had been having major difficulties maintaining focus and dealing with aggressive impulses.

(R. 10, PageID #: 622.)  Concerning J.R.'s abilities and limitations in caring for self, Dr. House opined:

> [J.R.] can complete self-care to some degree.  Mother described having rather a struggle with him to complete his hygiene.  He is independent in toileting, eating. He is not totally able to sleep alone at this point.  That he is able to ask for help

effectively when he needs it also seems somewhat limited.  He is aware of his mood states to some degree.  He does verbalize some appropriate coping skills, but that he actually puts these interventions to use is unclear.  He can still have temper outbursts.  They sometimes are not especially short lived.  There can be some emotional extremes such as some attempts at self-injury, namely self-hitting and scratching.  They tend to be on the borderline of continuing to be of significant and prolonged distress.  The mother said they will last about an hour which is a rather long time.

(R. 10, PageID #: 622.)

State agency psychological consultant, Vicki Warren, Ph.D., opined on July 30, 2014, that J.R. had less than marked limitations in attending and completing tasks, and caring for self. (R. 10, PageID #: 157.)  On reconsideration, on November 3, 2014, state agency psychological consultant, Tonnie Hoyle, Psy.D. concurred that J.R. had less than marked limitations in attending and completing tasks, and caring for self.  (R. 10, PageID #: 168-169.)

On May 21, 2015, Psychiatric clinical nurse specialist, Megan Clark, completed a questionnaire on medical and functional equivalence.  (R. 10, PageID #: 624-627.)  Nurse Clark indicated on the form, without any narrative explanation, that J.R. had an extreme limitation in interacting and relating with others, and caring for self; a marked limitation in attending and completing tasks; a moderate limitation in acquiring and using information; and, no evidence of limitations in moving about and manipulating objects, and in health and physical well-being.  *Id.* at PageID #: 624-626.  J.R. was receiving in-school and in-home counseling.  *Id.* at 626.  Clark noted that J.R.'s disorders caused ongoing problems with the claimant's functioning.  *Id.*

On December 9, 2015, Deborah Schmidt filled out a "School Activities Questionnaire." (R. 10, PageID #: 336-337.)  Ms. Schmidt indicated she was J.R.'s teacher in fifth grade and then-currently sixth grade.  *Id.* at 336.  Ms. Schmidt opined that J.R. can function at the sixth-grade level, but his behavior impaired his learning.  *Id.*  Using a 1-10 scale, Ms. Schmidt assessed J.R.'s functioning in relation to his classmates as worst ("0") in the following areas:

10

ability to understand and complete assignments on time, ability to respond to changes in routine, and ability to respond to criticism.  She gave him a "1" rating in the areas of attention span and concentration in class, ability to work independently of teacher supervision, and ability to progress in learning the skills involved in reading, writing, and mathematics; and gave him a "2" rating for ability to follow instructions.  *Id.*  The teacher noted that J.R. functions normally when he is on his medication, but when he is "off his meds" he is disruptive and verbally abusive, and is getting aggressive toward adults.  *Id.*

Ms. Schmidt indicated that she had specific behavioral concerns about J.R.'s fighting and insubordination.  (R. 10, PageID #: 337.)  She noted he was aggressive during sports and games, and that he had frequently required parental intercession, police or counselor mediation.  *Id.*  Ms. Schmidt also commented:  "Defies authority.  Walks out of the classroom.  Does what he wants.  Refuses to listen."  *Id.*

## IV. ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in his May 2, 2016, decision:

1.  The claimant was born on December 12, 2002.  Therefore, he was a school-age child on April 21, 2014, the date the application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since April 21, 2014, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), mood disorder/depression, and oppositional defiant disorder (ODD) (20 CFR 416.924(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925, and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.  The claimant has not been disabled, as defined in the Social Security Act, since April 21, 2014, the date the application was filed (20 CFR 416.924(a)).

(R. 10, PageID #: 71, 72, 86.)

In finding that J.R. was not disabled, the ALJ determined that J.R. has less than marked limitation in acquiring and using information (R. 10, PageID #: 78-80), attending and completing tasks (*id.* at 80-81), and in caring for himself (*id.* at 83-85).  The ALJ found that J.R. has marked limitation in interacting and relating with others.  (R. 10, PageID #: 81-82.)  The ALJ also found that J.R. has no limitation in moving about and manipulating objects (R. 10, PageID #: 82-83), or health and physical well-being (*id.* at 85).  The ALJ thus found that J.R. does not have an impairment, or combination of impairments that result in either "marked" limitations in two domains of functioning, or "extreme" limitation in one domain of functioning.  (R. 10, PageID #: 85.)

V.  DISABILITY STANDARD

A child claimant, under the age of 18, is entitled to receive SSI benefits only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381. As in any Social Security disability case, the claimant bears the ultimate burden of proof of disability.  20 C.F.R. § 416.912(a); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).

Social Security Administration regulations require an ALJ to follow a three-step sequential analysis when determining whether a person under the age of 18 is disabled.  *See* 20

C.F.R. § 416.924(a); *see, e.g.*, *Thomas ex rel. T.E. v. Commissioner*, No. 1:14CV0284, 2015 WL 1456447, at *4 (N.D. Ohio Mar. 30, 2015); *Maupin v. Commissioner*, No. C-1-07-74, 2008 WL 687123, at *2 (S.D. Ohio Mar. 10, 2008); *Smith ex rel. Enge v. Massanari*, 139 F. Supp. 2d 1128, 1132 (C.D. Cal. 2001).  First, the ALJ determines whether the minor-claimant is engaging in substantial gainful activity ("SGA").  If the claimant is engaging in SGA, he is not disabled, regardless of his medical condition, age, education, or work experience.  If the claimant is not engaging in SGA, the analysis proceeds to step two.  20 C.F.R. §§ 416.924(b); 416.972.

Second, the ALJ must determine whether the minor-claimant has a medically determinable impairment, or a combination of impairments, that is "severe."  A medically determinable impairment, or a combination of impairments, is not "severe" if it is a slight abnormality, or a combination of slight abnormalities, that causes no more than minimal functional limitations.  If the claimant does not have a severe impairment, he is not disabled.  If he does, the analysis proceeds to the third step.  20 C.F.R. §§ 416.924(a), (c).

Third, the ALJ must determine whether the claimant has an impairment, or combination of impairments, which meets or medically equals the severity of a listing, or that functionally equals the listings.  In doing so, the ALJ must consider the combined effect of all medically determinable impairments, including those that are not severe.  If the claimant has an impairment, or combination of impairments, that meets or medically equals the severity of a listing, or that functionally equals the listings, and it has lasted or is expected to last for a continuous period of at least 12 months, he is presumed to be disabled.  If not, the claimant is not disabled.  20 C.F.R. §§ 416.923, 416.924(d), 416.924a(b)(4), and 416.926a(a) and (c).

In determining whether an impairment or combination of impairments functionally equals a listing, the ALJ must assess the claimant's functioning in six areas ("domains"):  (1) acquiring

and using information, (2) attending and completing tasks, (3) interacting and relating with

others, (4) moving about and manipulating objects, (5) caring for one's self, and (6) health and

physical well-being.  In making this assessment, the ALJ must compare how appropriately,

effectively and independently the claimant performs activities compared to the performance of

other children of the same age who do not have impairments.  To functionally equal the listings,

the claimant's impairment(s) must result in "marked" limitations in two domains of functioning

or an "extreme" limitation in one domain.  20 C.F.R. §§ 416.926a(b)(1) and (d).

In assessing whether the claimant has "marked" or "extreme" limitations, the ALJ must

consider the functional limitations from all medically determinable impairments, including any

impairments that are not severe (20 C.F.R. § 416.926a(a)).  Consideration must also be given to

the interactive and cumulative effects of the claimant's impairment(s) in any affected domain (20

C.F.R. § 416.926a(c)).

A child has a "marked" limitation in a domain when his impairment(s) "interferes

seriously" with the ability to independently initiate, sustain, or complete activities.  20 C.F.R. §

416.926a(e)(2).  A child has an "extreme" limitation in a domain when his impairment(s)

interferes "very seriously" with the ability to independently initiate, sustain, or complete

activities.  20 C.F.R. § 416.926a(e)(3).  A child's day-to-day functioning may be seriously, or

very seriously, limited even if the impairment(s) limit(s) only one activity, or when the

interactive and cumulative effect of the impairment(s) limit(s) several activities.


VI. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to determining

whether the ALJ applied the correct legal standards, and whether the ALJ's findings are

14

supported by substantial evidence. *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Commissioner*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich Feb. 27, 2012) (quoting *Heston v. Commissioner*, 245 F.3d 528, 535 (6th Cir. 2001).).

## VII. ANALYSIS

The ALJ's decision determined in pertinent part that J.R. has less than marked limitation in attending and completing tasks (R. 10, PageID #: 80-81), and in caring for himself (*id.* at 83-85). Reyes asserts substantial evidence does not support the Administrative Law Judge's

determination that the plaintiff had less than marked limitations in these domains, in light of the medical evidence and the opinions of Nurse Megan Clark and Ms. Schmidt.  (R. 13, PageID #: 705.)  Reyes contends that the medical record demonstrates marked limitations in these domains. *Id.* at PageID #: 705-710.

## A.  Caring for Self

The domain of "caring for yourself" considers:

> . . . how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions and living area.

20 C.F.R. § 416.926a(k); SSR 09-7p, 2009 WL 396029 at *2; *Addison ex rel. K.S. v. Commissioner*, No. 1:16CV2996, 2018 WL 1419379, at *11 (N.D. Ohio Mar. 22, 2018).  For example, a school-age child should be independent in most day-to-day activities (dressing, bathing, etc.), although he may still need occasional reminders, and should begin to recognize that he is competent in doing some activities, but has difficulty doing others.  20 C.F.R. § 416.926a(k)(2)(iv).  The child should begin to develop understanding of right and wrong, and what is acceptable and unacceptable behavior.  *Id.*

The domain of caring for self does not concern the ability to relate to other people, which is addressed in the domain of "interacting and relating with others."  SSR 09-7p, 2009 WL 396029 at *2.  Although the domains of caring for self and interacting and relating with others are related, they are different from each other.  *Hawthorne ex rel. K.H. v. Colvin*, No. 1:13CV1497, 2014 WL 2920811, at *5 (N.D. Ohio June 27, 2014) (quoting SSR 09-7p).  For example, fighting and aggression toward others is evaluated properly in the domain of interacting and relating with others.  *Hawthorne*, 2014 WL 2920811, at *6.  The domain of caring for self

encompasses a child's ability to address his own emotional and physical needs. *Shannon ex rel. K.J.S. v. Astrue*, No. 1:12CV953, 2013 WL 149819, at *18 (N.D. Ohio Jan. 14, 2013) (citing SSR 09-7p).  In evaluating this domain, the child's ability to cope with stress, frustration, and negative feelings; the child's ability to self-regulate; suicidal ideation or self-harm; are among the issues to be considered.  *See, e.g.*, *Barber ex rel. D.A. v. Commissioner*, No. 1:16CV2436, 2017 WL 3447834, at *16-*17 (N.D. Ohio July 28, 2017), *adopted by* 2017 WL 3438551 (N.D. Ohio Aug. 10, 2017); *Hawthorne*, 2014 WL 2920811, at *6; *Shannon*, 2013 WL 149819, at *18.

In finding that J.R. has less than marked limitation in the ability to care for himself, the ALJ addressed the domain as follows:

> The claimant's mother indicated on a function report that the claimant's impairments do not affect his ability to take care of his personal needs.  However, the claimant's mother testified that he hurts and scratches himself, and she reported to a consultative examiner that she has to remind him to complete his personal hygiene.  The claimant also reported to a consultative examiner that he has tried to hurt himself by jumping off something.  However, the claimant testified that he can shower and feed himself.  The consultative examiner noted that claimant was dressed in clean, age-appropriate attire.  Further, the claimant's pediatrician noted that he was eating healthy and brushing his teeth daily.  Thus, the claimant has less than marked limitation in the ability to care for himself.

(R. 10, PageID #: 84-85 (internal citations omitted).)

Reyes argues that the ALJ improperly focused more on the physical aspect of caring for self, and "seemed to gloss over the emotional aspect."  (R. 13, PageID #: 708.)  According to Reyes, J.R.'s "anger outbursts, emotional dysregulation, and his emotional extremes" should have led to a finding of a marked limitation in this domain.  *Id.*  Reyes asserts that the evidence demonstrates that J.R. engaged in behaviors that were harmful to him and others, he was unable to regulate his moods, and he was unable to express his feelings.  *Id.*

The Commissioner responds that Dr. House's opinion supported a finding that J.R. could complete self-care to some degree, although he needed to be reminded to complete hygiene

tasks. (R. 14, PageID #: 726.) The Commissioner recognizes that Dr. House also stated that claimant was somewhat limited in his ability to ask for help when needed, and had temper outbursts and some emotional extremes. (R. 14, PageID #: 726, citing R. 10, PageID #: 77, 622.)

The claim is that substantial evidence does not support the ALJ's determination that J.R. had less than marked limitation in the domain of caring for self, in light of the medical evidence. (R. 13, PageID #: 705, 708.) The court finds the ALJ did not provide a sufficient analysis of this domain. Although the ALJ addressed J.R.'s ability to take care of his physical needs such as hygiene and dressing himself, the ALJ's analysis of J.R.'s ability to take care of his emotional needs is not supported by substantial evidence. *See, e.g.*, *Shannon*, 2013 WL 149819, at *18 (evidence cited to support ALJ's conclusion regarding claimant's limitations in this domain does not consider ability to address emotional needs). The ALJ's decision contains a limited assessment of the emotional aspect of this domain, and simply recognized that J.R. had issues with self-harm. (R. 10, PageID #: 84-85; *see generally* PageID #: 439, 462, 621 (self-harm, such as scratching himself and otherwise trying to hurt himself).)

The record shows that J.R. had persistent problems with controlling his anger (R. 10, PageID #: 355, 432, 439, 462, 464-465, 621, 663, 674, 684); self-regulation and controlling his emotions and impulses (*id.* at 432, 462, 686); difficulty expressing his feelings (*id.* at 432, 686); inability to focus and easily distracted (*id.* at 355, 432, 434, 684); hyperactivity (*id.* at 462); disruptive mood swings (*id.* at 432, 434, 462, 665, 676, 686); and, insomnia and disturbed sleep (*id.* at 437, 462, 621). Dr. House noted J.R.'s limitations in caring for self included temper outbursts and "emotional extremes such as some attempts at self-injury, namely self-hitting and scratching," which persisted for a long time. *Id.* at 622. Nurse Clark opined that J.R. had an extreme limitation in caring for self. *Id.* at 626. Although the ALJ recites some of this evidence

18

elsewhere in the decision, the ALJ does not meaningfully analyze the evidence in the context of determining J.R.'s limitations in the domain of caring for self. *See* R. 10, PageID #: 84-85; *see generally Barber*, 2017 WL 3447834, at *16-*17 (record is replete with claimant's difficulties in maintaining a healthy emotional state). The ALJ did not provide a sufficient analysis of this domain; thus, the decision on this issue is not supported by substantial evidence.

## B. Attending and Completing Tasks

The domain of "attending and completing tasks" considers:

> . . . how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them.

20 C.F.R. § 416.926a(h); SSR 09-4p; *Deleon ex rel. J.D. v. Commissioner*, No. 1:12CV1149, 2013 WL 3865106, at *10 (N.D. Ohio July 24, 2013). For example, a school-age child should be able to focus his attention in a variety of situations to follow directions, remember and organize his schoolwork, and complete assignments. 20 C.F.R. § 416.926a(h)(2)(iv); SSR 09-4p. The child should be able to concentrate on details and not make careless mistakes in his work. *Id.* He should be able to change activities without distraction, stay on task and in place when appropriate, and sustain attention in order to participate in group sports, read by himself, and complete family chores. *Id.*

In finding that J.R. has less than marked limitation in attending and completing tasks, the ALJ addressed the domain as follows:

> The claimant's mother reported that he has significant difficulty in this area, including turning in homework and completing household chores. His ETR evaluation indicated that during testing he was easily distracted and needed instructions repeated and prompting to finish but was cooperative and worked hard. The claimant testified that he plays football and video games and likes to draw, which requires sustained levels of attention and participation. The claimant

19

also testified that he is able to use public transportation.  Further, the claimant's
home room teacher indicated that he has difficulty with his attention span and
concentration in class, but he functions normally with medication.  Treatment
notes from claimant's mental health provider indicated that his ADHD was stable
and his thought content and processes were normal.  In addition, the consultative
examiner determined that the claimant can pay attention to some degree in
response to direct questions from an adult in a one-on-one situation, and although
he would have difficulty sustaining attention for longer periods of time, his
medication assists in maintaining focus and he has done better in a group setting.
Accordingly, I find the claimant has less than a marked limitation in this domain.

(R. 10, PageID #: 80-81 (internal citations omitted).)

Reyes argues that substantial evidence does not support the ALJ's determination.  Reyes

contends that the ALJ improperly weighed the evidence, and asserts that "[t]he evidence taken as

a whole supports a marked limitation in the domain of attending and completing tasks."  (R. 13,

PageID #: 710.)  Plaintiff's filings point to evidence that would support a contrary conclusion to

the ALJ's determination.  *Id.* at  PageID #: 709-710.

The relevant issue, however, is not whether there is evidence to support a ruling different

than that reached by the ALJ.  *Lebro ex rel. R.L. v. Commissioner*, No. 1:13CV1355, 2014 WL

3749221, at *11 (N.D. Ohio July 29, 2014).  The Commissioner's determination must stand if

supported by substantial evidence, regardless of whether some evidence might support another

conclusion.  *See Brown ex rel. JK v. Astrue*, No. 07-4201-CV, 2009 WL 59167, at *1 (2d Cir.

Jan. 12, 2009);  *Kidd v. Commissioner*, No. 99-6481, 2001 WL 345787, at *3 (6th Cir. Mar. 27,

2001); *Martin ex rel. Martin v. Chater*, 91 F.3d 144, 1996 WL 428403, at *4 (6th Cir. 1996)

(TABLE, text in WESTLAW) (per curiam); *Mullen*, 800 F.2d at 545*; Kinsella*, 708 F.2d at 1059.

Here, the ALJ's decision demonstrates that the ALJ sufficiently considered the evidence of

record and explained the decision regarding the domain of attending and completing tasks.  The

claimant's argument that the ALJ erred in concluding that J.R. has less than marked limitations

in the attending and completing tasks domain is without merit.  *See, e.g.*, *Deleon*, 2013 WL 3865106, at *10.

## C.  Nurse Clark's Opinion

Reyes contends that the ALJ erred in failing to grant appropriate weight to the opinion of Megan Clark, the treating psychiatric clinical nurse specialist.  (R. 13, PageID #: 710-712.)  The claimant contends that substantial evidence does not support the ALJ's determination that J.R. had less than marked limitation in the domain of caring for self, "in light of the medical evidence and the opinions of Megan Clark and Ms. Schmidt."  (R. 13, PageID #: 705, 708.)  The Commissioner responds that the ALJ properly gave greater weight to the opinions of Dr. House, and the state agency psychological consultants, over the opinion of Nurse Clark, whose opinion is not entitled to any deference.  (R. 14, PageID #: 727, citing *Hill v. Commissioner*, No. 13-6101, 2014 WL 1257948, at *2 (6th Cir. Mar. 27, 2014).)

Nurse Clark's May 21, 2015, medical and functional equivalence evaluation indicated, without any narrative explanation, that J.R. had an extreme limitation in caring for self, and a marked limitation in attending and completing tasks.  (R. 10, PageID #: 625-626.)  Reyes argues that Nurse Clark was the best medical source to evaluate J.R.'s limitations, and that the ALJ should have granted greater weight to her opinion.  (R. 13, PageID #: 711.)

The ALJ, in assessing Nurse Clark's opinion, discussed among other factors, her May 2015 evaluation, the nature and length of the treatment relationship ("since April 2014"), her specialization ("psychiatric clinical nurse"), and the consistency of her opinion with the record as a whole.  (R. 10, PageID #: 77; *see generally* 20 C.F.R. § 416.927(c).)  The ALJ concluded:

> I find that Ms. Clark's opinion regarding extreme limitations is not supported by
> treatment notes that indicated the claimant was cooperative, happy, and doing

21

well, and showed signs of improvement with medication.  I also find that Ms.
Clark's opinion is inconsistent with the opinion of the consultative examiner who
noted that the claimant's medication enabled him to do much better in a group
setting and sustain relationships with others.  Further, although the consultative
examiner noted that the claimant exhibited some emotional extremes and attempts
at self-injury, he did not find extreme limitations in his ability to care for himself.
Accordingly, I give limited weight to Ms. Clark's opinion.

(R. 10, PageID #: 77 (internal citations omitted).)

At the time that Reyes filed the claim[2], a clinical nurse specialist was not considered an

"acceptable medical source."  20 C.F.R. § 416.913(a) (2013).  Even so, an ALJ must consider

other-source opinions and "generally should explain the weight given to opinions for these 'other

sources,'" although such opinions are not entitled to any special deference.  *Hill*, 2014 WL

1257948, at *2 (quoting SSR 06-03p).  The ALJ considered the relevant factors in assessing

Nurse Clark's opinion, as noted above, and assigned it "limited weight."  (R. 10, PageID #: 77;

*see generally* 20 C.F.R. § 416.927(c).)  The ALJ, conversely, gave significant weight to Dr.

House's opinion, as the ALJ determined it was consistent with treatment notes, which

demonstrated stability and improvement with medication.  (R. 14, PageID #: 726-727, citing R.

10, PageID #: 77 (which cites MER in support).)

The court finds that substantial evidence supports the ALJ's assessment of Nurse Clark's

opinion, and it accords with the relevant regulations concerning the evaluation of opinion

---

[2]  Revisions to regulations regarding the evaluation of medical evidence went
into effect on March 27, 2017, and purport to apply to the evaluation of opinion
evidence for claims filed before March 27, 2017.  82 *Fed. Reg.* 5844-5884 (Jan. 18,
2017).  Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was
rendered before the new regulations took effect.  For the sake of consistency, the
court continues to cite the language from the former regulations that were in effect
at the time of the ALJ's decision.

22

evidence.  *See generally* 20 C.F.R. § 416.927(c); SSR 06-3p.  Plaintiff's argument, therefore, is
not availing.


### D.  Teacher's Opinion

Reyes also contends that the ALJ erred in failing to grant appropriate weight to the
December 9, 2015, opinion of J.R.'s teacher, Deborah Schmidt.  (R. 13, PageID #: 712-714; *see
generally* R. 10, PageID #: 336-337.)  Ms. Schmidt rated J.R. as worst in his class in several
different areas of functioning, as discussed above.  (R. 10, PageID #: 336-337.)  When he was on
his medication, she noted him as normal, but when he was not taking his medication, she
indicated he was disruptive, verbally abusive, and aggressive.  *Id.*

Teachers are considered "other sources," rather than acceptable medical sources, under
the regulations.  *Kump v. Commissioner*, No. 1:14CV2384, 2015 WL 7774303, at *7 (N.D. Ohio
Dec. 2, 2015) (citing SSR 06-3p, 2006 WL 2329939, at *1-*2); *Hatley v. Commissioner*, No.
1:13CV1189, 2014 WL 3670078, at *8 (N.D. Ohio July 22, 2014).  While information from
other sources cannot establish the existence of an impairment, "the information may provide
insight into the severity of the impairment," and how it affects the individual's ability to
function.  SSR 06-3p, 2006 WL 2329939, at *2-*3; *Cruse v. Commissioner*, 502 F.3d 532, 541
(6th Cir. 2007); *Kump*, 2015 WL 7774303, at *7.  Opinions from "other sources" who have seen
the claimant in a professional capacity should be evaluated by considering how long the source
has known the claimant, how consistent the source's opinion is with other evidence, and how
well the source's opinion is explained.  *Cruse*, 502 F.3d at 541; *Hatley*, 2014 WL 3670078, at
*9.

In assessing Ms. Schmidt's opinion, the ALJ discussed, among other factors, her December evaluation, the nature and length of their relationship (teacher, had known claimant for two years), her specialization (elementary school teacher), and the consistency of her opinion with the record as a whole (opinion that J.R. functions normally with medication is consistent with treatment records).  (R. 10, PageID #: 77-78; *see generally* 20 C.F.R. § 416.927(c).)  The ALJ evaluated her opinion under SSR 06-3p as a non-acceptable medical source, and concluded that her opinion was entitled to "partial weight."  (R. 10, PageID #: 77-78.)

The court finds that the ALJ's assessment of Ms. Schmidt's opinion is supported by substantial evidence, and accords with the relevant regulations concerning the evaluation of opinion evidence.  *See generally* 20 C.F.R. § 416.927(c); SSR 06-3p.  Plaintiff's argument to the contrary is not persuasive.


## VIII. CONCLUSION

For the foregoing reasons, the court finds that substantial evidence does not support the Commissioner's entire decision.  In particular, the undersigned recommends that the ALJ's decision be reversed and remanded for reconsideration of the claimant's limitations concerning the domain of caring for self.


s/ David A. Ruiz
David A. Ruiz
United States Magistrate Judge


Date:  June 11, 2018

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).